UNITED STATES  DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

WANDA JAMES                              CIVIL ACTION

VERSUS                                   NUMBER: 12-2793

CAROLYN W. COLVIN, ACTING                SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's applications for Disability Insurance Benefits ("DIB") and for Supplemental Security Income ("SSI") benefits based upon disability.  (Rec. docs. 12, 14).

Wanda James, plaintiff herein, filed the subject applications for DIB and SSI benefits on October 22, 2010, alleging disability as of October 1, 2010.  (Tr. pp. 128-133, 134-137).  In a Disability Report that appears in the record, the conditions resulting in plaintiff's inability to work were identified as HIV,

depression, angina, asthma, high blood pressure, and unspecified physical challenges. (Tr. pp. 151-158). Plaintiff's applications for Social Security benefits were denied at the initial level of the Commissioner's administrative review process on December 7, 2010. (Tr. pp. 79-82). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on June 28, 2011 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 85-86, 21-56). On July 14, 2011, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 7-20). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 1-6). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.  THE ALJ FAILED TO APPLY THE CORRECT LEGAL STANDARD IN FINDING THAT PLAINTIFF'S DEPRESSION WAS NOT A SEVERE IMPAIRMENT.

II.  THE ALJ FAILED TO APPLY THE PROPER LEGAL STANDARD TO DETERMINE THE CREDIBILITY OF THE PLAINTIFF.

III. THE [ALJ] DID NOT APPLY THE CORRECT LEGAL STANDARD IN ASSESSING PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY.

(Rec. doc. 12-1, p. 7).

2

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1.   [t]he claimant meets the insured status requirements of the Social Security Act through December 31, 2014.

2.   [t]he claimant has not engaged in substantial gainful activity since October 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3.   [t]he claimant has the following severe impairments: asymptomatic HIV infection; asthma; and obesity (20 CFR 404.1520(c) and 416.920(c)).

4.   [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.   [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the ability never to climb ladders, ropes or scaffolds; the need to avoid concentrated exposure to extreme cold and extreme heat; and the need for work in a low stress environment, defined as having only occasional changes in the work setting.

6.   [t]he claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7.   [t]he claimant was born on May 20, 1960 and was 50 years old, which is defined as an individual closely approaching advanced age, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8.   [t]he claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9.   [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.  [c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11.  [t]he claimant has not been under a disability, as defined in the Social Security Act, from October 1, 2010, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. pp. 12, 13-14, 15, 16).

Judicial review of the Commissioner's decision to deny DIB or SSI benefits is limited under 42 U.S.C. §405(g) to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards.  Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987).  If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.  42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1970).  A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision.  Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  Jones v. Heckler, 702 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts. Patton v. Schweiker, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking DIB or SSI benefits bears the burden of proving that she is disabled within the meaning of the Social

4

Security Act.  Harrell v. Bowen, 862 F.2d 471, 475 (5th Cir. 1988).
Disability is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which...has lasted or
can be expected to last for a continuous period of not less than 12
months."  42 U.S.C. §§423(d)(1)(A) and 1382c(a)(3)(A).  Once the
claimant carries her initial burden, the Commissioner then bears
the burden of establishing that the claimant is capable of
performing substantial gainful activity and is, therefore, not
disabled.  Harrell, 862 F.2d at 475.  In making this determination,
the Commissioner utilizes the five-step sequential analysis set
forth in 20 C.F.R. §§404.1520 and 416.920, as follows:

> 1.  an individual who is working and engaging in
> substantial gainful activity will not be found disabled
> regardless of the medical findings.
>
> 2.  an individual who does not have a "severe
> impairment" will not be found to be disabled.
>
> 3.  an individual who meets or equals a listed
> impairment in Appendix 1 of the Regulations will be
> considered disabled without consideration of vocational
> factors.
>
> 4.  if an individual is capable of performing the work
> that she has done in the past, a finding of "not
> disabled" must be made.
>
> 5.  if an individual's impairment precludes her from
> performing her past work, other factors, including age,
> education, past work experience, and residual functional
> capacity, must be considered to determine if other work
> can be performed.

On the first four steps of the analysis, the claimant bears

the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past.  Bowen v. Yuckert, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist.  Fraga, 810 F.2d at 1304 (citing Lawler v. Heckler, 761 F.2d 195, 198 (5th Cir. 1985)).  Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding.  Mays v. Bowen, 837 F.2d 1362, 1364 (5th Cir. 1988); Fraga, 810 F.2d at 1302.

The documentary evidence that was generated during the relevant time period[1]/ begins with a treatment note from Dr. Malea Maynard dated October 23, 2009.  Plaintiff had just relocated to Dallas for work and was desirous of establishing a relationship with a new primary care physician in connection with her complaints of headaches and for follow-up treatment of her hypertension ("HTN"), asthma, and HIV.  Plaintiff had received treatment for her

---

[1]/ Under 20 C.F.R. §§404.1512(d) and 416.912(d), the Commissioner is required to develop the medical history of a DIB/SSI claimant for at least twelve months prior to the month in which the applications for benefits were filed unless there is reason to believe that development of an earlier time period is necessary.  As plaintiff filed her applications for DIB/SSI benefits on October 22, 2010 and alleged an onset date of October 1, 2010, the relevant time period begins in September of 2009.

asthma at an emergency room several days earlier and had exhausted her supply of HTN medication two days earlier.  There was no shortness of breath, coughing, or wheezing.  She also complained of a depressed mood and poor sleep.  The impressions were asthma with a recent exacerbation, poorly-controlled HTN, HIV, angina, and depression.  Plaintiff's medications were refilled and adjusted, referrals were made to the infectious disease and cardiology departments, and plaintiff was to return in one month.  (Tr. pp. 203, 206, 208-210).

Pursuant to a referral from Dr. Maynard, on February 3, 2010, plaintiff was seen by Dr. Paul Aggarwal of the North Texas Heart Center.  The problem list included HIV positive status, hypertensive heart disease, and chest pain, with the latter condition being the reason for the consultation.  Plaintiff recalled a history of chest discomfort on and off for the previous year, unassociated with exertion, dyspnea, or syncope.  Her blood pressure was high at 175/100 but she had a regular rate and rhythm with no murmurs, rubs, or gallops.  An EKG revealed sinus rhythm. The assessment was atypical chest pain.  A stress test was to be scheduled as well as an echocardiogram to rule out certain conditions.  (Tr. pp. 232-233).

Plaintiff returned to Dr. Maynard on February 10, 2010 with her chief complaint being a breakout on her face.  She had missed taking her HTN medication that day after having run out and her

7

blood pressure had spiked with some headaches but no chest pain, dyspnea on exertion, or shortness of breath.  Plaintiff had not purchased a peak flow meter yet.  Medical history was positive for diagnoses of asthma and HIV in 2003 as well as HTN and angina. Medications at the time included Effexor, Lutrel, Oxycodone, Tramadol, Atripla, Netrostat, Singulair, HCTZ, and KCL.  The impressions were dermatitis, poorly-controlled HTN, poorly-controlled asthma, and HIV.  Plaintiff's treatment plan was reviewed and adjusted.  (Tr. pp. 204-205, 214).  Labwork was done on March 9, 2010.  (Tr. pp. 246-248).

On April 1, 2010, plaintiff was evaluated by Dr. Clinton Haley of North Texas Infectious Disease Consultants, P.A., again pursuant to a referral from Dr. Maynard.  Plaintiff was off of her antidepressant medication secondary to financial issues but reported that with the exception of occasional increased emotional reactions, overall her depression was well-controlled without suicidal ideation.  Atripla was being tolerated well with no missed doses and plaintiff's asthma and HTN were said to be well-controlled.  The assessment was HIV, well-controlled with Atripla with viruses being fully suppressed and a CD4 count of 617; depression, more of a situational anxiety/depression with a more affordable substitute for Effexor to be explored; HTN, continue current regimen; stable asthma, continue current regimen; and, various health maintenance measures to be taken.  (Tr. pp. 218-221,

228-231).

Plaintiff underwent myocardial perfusion imaging studies on April 19, 2010 which produced normal results with no stress ECG evidence of ischemia, only atypical non-limiting chest pain during exercise.  Plaintiff's HTN was under control at home.  She declined further cardiac testing at that time.  (Tr. pp. 223-227).  Various labwork was done on July 23, 2010.  (Tr. pp. 244-245).  Plaintiff returned to Dr. Haley on August 3, 2010 and reported general compliance with her medication regimen.  However, she was in the middle of a divorce with resulting anxiety and depression for which she had not sought psychiatric care as was agreed upon at the last visit.  There was no shortness of breath, fever, or chills and a flu-like illness of the previous week had resolved.  Although plaintiff complained of malaise and insomnia, the results of a physical examination were normal except for some bilateral foot pain and left sided back pain.  The assessment was HIV with VL of 900 which was suspected to be the result of medication noncompliance.  Further testing was contemplated.  (Tr. pp. 215-217).

Plaintiff was seen again by Dr. Maynard on August 20, 2010 with the chief complaint being follow-up for HTN and depression.  She felt more short of breath and had a cough after running out of Singulair and had obtained a peak flow meter but had misplaced it.  Plaintiff had also run out of Effexor two months earlier resulting

9

in decreased mood, crying easily, poor sleep, and decreased energy. She also complained of multiple muscle and joint aches. The impressions were asthma for which her medications were adjusted and Singulair was to be resumed; HTN, slightly elevated that day; depression, for which medication was to be resumed and counseling was encouraged; and, migraines, to be treated with Tramadol. (Tr. pp. 201-202, 207, 212). HIV-related labwork was done on September 1, 2010. (Tr. p. 243).

On September 16, 2010, plaintiff was seen again by Dr. Haley, the chief complaint being identified as HIV. Plaintiff reported leg pain status post surgery for which she was doing rehabilitative exercises. She was also having a flare in her migraine headaches possibly due to multiple stressors including a decrease in income and the finalizing of her divorce. Plaintiff stated that she was 100% compliant with Atripla and was seeing a psychiatrist and was on Effexor. Although she was generally feeling poorly, there were no systems symptoms. The assessment was HIV with improved lab results and with plaintiff to remain on Atripla in light of a lack of suicidal or homicidal ideations and her ongoing psychiatric treatment; depression; migraines; and, facial itching and bumps. (Tr. pp. 237-240).

Plaintiff returned to Dr. Haley on September 24, 2010, this time complaining of two weeks of intermittent nausea and vomiting on an average of one or two episodes per day. Migraine equivalent

10

headaches had also occurred periodically over the previous two weeks and plaintiff had developed a pruritic rash.   A systems review was unremarkable.   The assessment was nausea/vomiting of unknown etiology; HIV, with a possible change in medication regimen to be considered; and, depression, on Atripla and with ongoing psychiatric treatment.   (Tr. pp. 235-236, 238, 241-242).

On October 7, 2010, plaintiff presented herself to the Touro Infirmary Emergency Room ("ER") with complaints of abdominal pain of three weeks' duration in the upper and lower left quadrant along with nausea and vomiting.   Medications at the time included Singulair, Atripla, Hydrochlorothiazide, Lotrel, Potassium Chloride, and Tramadol.   After various tests were run and medications were administered, plaintiff was discharged home in good condition with a diagnosis of abdominal pain of unknown cause and a bladder infection.   A CT scan that was taken at the time revealed a simple right renal cyst.   (Tr. pp. 277-303).

On November 4, 2010, plaintiff completed the Administration's "Function Report-Adult" form that was designed to elicit information about how her conditions limited her activities. There, plaintiff indicated that shortness of breath, pain in the left leg and foot, migraine headaches, depression, anxiety, forgetfulness, and emotional upsetment causing asthma attacks impacted her ability to work.   Plaintiff's daily routine was described as wrought with anxiety, crying spells, forgetfulness,

and poor sleep.  Every facet of her ability to engage in personal care was reportedly affected by her conditions.  Plaintiff could prepare simple meals and wash dishes but her daughter did the laundry.  She did not drive, rarely got out of the house and was generally unsociable, and shopping time was kept to a minimum.  Interests included watching TV and listening to gospel music but plaintiff sometimes just wanted to be alone with no noise in a dark room.  With the exception of reaching, hearing, following instructions, and using her hands, all of plaintiff's abilities were affected by her condition to one extent or another.  The ability to walk varied but was generally limited to one block. (Tr. pp. 168-175).

On December 7, 2010, an Administration doctor and a psychologist reviewed plaintiff's file as it was then extant and found that she was capable of performing light-level work which included the security work that she had done in the past.  (Tr. pp. 249-254, 57-78).   In light of that finding, plaintiff's applications for DIB/SSI benefits were denied at the initial level of the Commissioner's administrative review process.  (Tr. pp. 79-82).

Plaintiff presented herself again to the Touro ER on December 19, 2010 with complaints of intermittent, aching headache pain for two days.  The pain was at times moderate in nature but had markedly improved by the time she made it to the ER.  The results

of a physical examination were unremarkable.  Plaintiff's condition improved with injections of Toradol and Compazine and she was discharged home in stable condition with prescriptions for those two drugs.  (Tr. pp. 304-329).

On December 28, 2010, plaintiff was seen at the Medical Center of Louisiana at New Orleans ("MCLNO") ER for medication refills after having moved back to New Orleans fairly recently.  Some of plaintiff's medications were refilled and she was to follow-up with the HIV Outpatient Program ("HOP") Clinic and her primary care physician.  (Tr. pp. 332-333).  Various labwork was done on January 14, 2011.  (Tr. pp. 349-368).  Plaintiff was next seen by Dr. Paula Seal of the MCLNO HOP Clinic on February 4, 2011.  She advised the doctor that she had resigned from work due to multiple medical problems including severe abdominal pain, migraine headaches, and angina.  Plaintiff had run out of Atripla one month earlier but had restarted it one week earlier.  She reported weight gain, left midquadrant abdominal pain one to three times per day that would resolve on its own for the previous month, increased forgetfulness, migraine headaches causing nausea and emesis, and worsening depression.  Upon physical examination, plaintiff was in no distress but was tearful and was wearing sunglasses secondary to migraine headaches.  Her left abdominal pain was unreproducible. The assessment was HIV with further testing to be undertaken; HTN, being treated; migraine headaches, for which plaintiff's medication

13

was to be adjusted; vitamin D deficiency; and, various health maintenance measures to be taken.  (Tr. pp. 334-337, 369).

Plaintiff was seen again at the HOP Clinic on February 23, 2011 for evaluation and treatment of depression of many years' duration.  She had no income, no job, was living with her daughter, and was increasingly depressed since her divorce.  Effexor did help somewhat but plaintiff had trouble sleeping at night and was very worried.  Plaintiff tended to isolate herself and recalled a near suicide attempt one year earlier.  Without a job her self-esteem was low and complications from bunion surgery left her in pain.  On mental status examination, plaintiff had good memory, clear thinking with logical thoughts, and no hallucinations, delusions, or suicidal ideations but she did have a depressed mood, a shy-type of personality, and a constricted affect.  Thought processes were believed to be within normal limits and behavior was appropriate. The impression was major depressive disorder, chronic and recurrent.  Plaintiff was to be started on Cymbalta and Zolpidem and was referred to support groups for counseling.  (Tr. pp. 338-339).

On March 23, 2011, plaintiff underwent mammographic studies which revealed no evidence of malignancy.  (Tr. p. 348).  She was then seen by Dr. Seal of the HOP Clinic on March 28, 2011. Genotype data prior to the appointment had not been obtained as was envisioned at plaintiff's previous visit.  She complained of

14

significant depression at baseline as well as significant left upper abdominal wall muscle spasms which were positional in nature, significant in bending forward or rotating to the left for five to fifteen minutes at a time prior to resolving on their own accord. Plaintiff had not obtained a refill of her blood pressure medication due to financial limitations.  She was tearful during the physical examination which was largely unremarkable except for significant tensing of the abdominal muscles but no organomegaly. The plan was to discontinue Atripla and to obtain a genotype that day with substitute medications to be prescribed.  Refills for plaintiff's HTN and migraine medications were also written.  An MRI was ordered for her abdominal pain, physical therapy and podiatry referrals were made for plaintiff's heel spurs, and Bactrim was prescribed for furunculosis of the arm.  (Tr. pp. 340-342, 370-374).

The following day, plaintiff was seen at the MCLNO Dermatology Clinic for complaints of recurring "boils" in the left axilla, the most recent one being one year earlier.  Plaintiff had three painful nodules that day in addition to some pruritus and scaliness to the face.  The assessment was furunculosis, to be treated with Bactrim and warm compresses, and seborrheic dermatitis that was to be treated with various creams.  (Tr. pp. 343-344).

The final treatment note that was admitted in the proceedings below documents plaintiff's return to Dr. Seal of the HOP Clinic on

April 28, 2011.  Complaints at the time included a facial rash of two weeks' duration, pruritic and burning along with watering of the eyes.  Plaintiff still had some depression but it was improving through her treatment with Dr. Urrutia.  Intermittent, self-resolving abdominal pain was still present but a CT scan failed to reveal its etiology and there was only mild tenderness on physical examination.  New HIV medication was prescribed and others for plaintiff's facial rash, HTN, hypokalemia, and asthma were continued.  (Tr. pp. 345-347, 375-379).

As noted earlier, a hearing before an ALJ went forward on June 28, 2011 with plaintiff and a VE in attendance.  After the documentary exhibits were admitted into evidence, plaintiff's attorney gave an opening statement in which he noted plaintiff's significant work history as a security officer until October of 2010 when she developed a constellation of medical problems including HIV, angina and hypertensive heart disease, migraine headaches, HTN, asthma, and depression.  Counsel further argued that the combination of these impairments precluded the performance of all work but even if plaintiff could perform sedentary work, with no skills being transferable from her previous employment, Rule 201.10 of the "Grids" would direct the conclusion that she was disabled.  (Tr. pp. 23-27).

Plaintiff then took the stand and was questioned by her attorney.  She was fifty-one years old at the time, stood 5'4" tall

16

and weighed 184 pounds, and had completed eleven years of formal education followed by vocational school. In the security field, plaintiff had worked in the hospitality industry protecting property, patrolling, writing reports, and monitoring the closed circuit camera system. That job entailed standing and walking eight to ten hours per day. When asked what caused her to stop working, plaintiff identified her HIV diagnosis in 2003, worsening depression and an inability to focus, and foot surgery in 2009, resulting in an inability to stand or walk for long periods of time and excessive work absences which ultimately caused her to resign. HIV-related symptoms included fatigue, poor sleep, and emotional outbursts, one of which plaintiff experienced as the hearing was underway. Asthma sometimes left her short-winded and feeling exhausted and HTN caused headaches and dietary changes. Depression also affected plaintiff's ability to function normally. From the numerous medications that she was taking, plaintiff experienced drowsiness but the increased dosage of her antidepressant medication did help keep her calm. For her feet, plaintiff relied upon ice packs and exercises for relief. (Tr. pp. 27-33).

When asked what she did during the day, plaintiff testified that she sat, read, listened to church music, kept a journal, and used a computer. She could perform some household chores but they left her short-winded as did walking one block. Plaintiff attended church functions only seldomly and did not attend any family-

related functions.   Standing was limited to one hour due to constant pain in the feet which was worse than it was prior to her surgery.   Sitting was preferable to lying down in terms of comfort but plaintiff reportedly had to keep her feet elevated to minimize swelling.   Typically, she would sit for eight to ten hours at a time, occasionally getting up and walking about to avoid stiffness. She was depressed and anxious about her HIV status, experiencing daily crying spells and suicidal thoughts in 2010.   Forgetfulness and difficulty concentrating were also issues.   (Tr. pp. 33-37).

Plaintiff was then questioned by the ALJ.   She testified that her increased forgetfulness and lack of organization were of recent origin and were not attributable to her age.   Plaintiff's blood pressure medication had recently been changed to something more effective and she additionally took a fluid pill.   She had never been hospitalized for depression or anxiety but she did see a psychiatrist who prescribed an antidepressant that made her calmer. Although no doctor had ever told plaintiff that she was unable to work, a psychiatrist she had seen in Dallas had advised her to ask her employer to lessen her responsibilities.   With respect to her HIV, plaintiff's viral loads had been very low but she had recently broken out in rashes and was more fatigued, anxious, and frustrated, sometimes not even wanting to get dressed or comb her hair.   When asked whether she would be able to sit for eight hours and perform a low-stress job, plaintiff testified that she would

18

like to work if she could but that she simply did not like being around people anymore.  She increasingly relied on her children for support.   Plaintiff  testified  that  she  became  exhausted  after walking one block and she experienced foot pain just getting to the hearing.  Although  she  was  able  to  pick  up  her  eighteen-pound grandson,  she  tired  very  quickly.   Plaintiff  had  at  one  point received  short-term  disability  benefits  but  had  never  received workers' compensation or unemployment benefits.  (Tr. pp. 37-46).

Mary Catherine Elvir, a VE, was the next witness to take the stand.   She  first  classified  plaintiff's  past  work  as  a  hotel industry security officer as light, semi-skilled work according to the Dictionary of Occupational Titles but that it was performed at the  medium  level  as  plaintiff  herself  described  it.  Elvir  further testified  that  the  positions  of  hotel  risk  agent  and  hotel  loss prevention officer fit within the security officer definition and that there were no readily transferable skills.  The ALJ then posed a  hypothetical  question  to  the  VE  which  assumed  an  individual  of plaintiff's  age,  education,  and  work  experience  who  was  capable  of light-level work with an at-will sit/stand option; was not off task more  than  10%  of  the  work  period;  could  never  climb ladders/ropes/scaffolds; who needed to avoid concentrated exposure to temperature extremes and to airborne irritants; and, who needed a  low-stress  job  with  only  occasional  changes  in  the  work  setting. With  those  limitations  in  mind,  the  VE  testified  that  the

individual described in the hypothetical question could not perform plaintiff's past work as it was customarily or actually performed. However, the individual could function as a general office clerk, a receptionist, or an information clerk, significant numbers of which existed in the local and national economies.  (Tr. pp. 46-50).

A second hypothetical question was then posed to the VE which assumed a person of plaintiff's age, education, and work experience who had all of the limitations that were included in the first hypo but who could only perform sedentary-level work.  Faced with that hypothetical question, the VE testified that the described individual could not perform plaintiff's past work.  However, the individual could serve as a general office clerk, a receptionist, an information clerk, or an interviewer.  Yet a third hypothetical question was framed for the VE which assumed an individual of plaintiff's age, education, and work experience who was capable of sedentary-level work and, due to a combination of medical conditions, associated pain, and mental impairments, would be unable to engage in sustained work activity for a full eight-hour workday on a regular and consistent basis.  With those limitations in mind, there would be no work that the described individual could perform.  The jobs that the VE had identified in answer to the first two hypotheticals were representative, not exhaustive.  (Tr. pp. 50-51).

The VE was then tendered to plaintiff's counsel for further questioning.  In response to those questions, the VE testified that a 50% reduction of the jobs that she had identified in answer to the first hypothetical had been made based upon inclusion of the sit/stand option.  The duties of a general office clerk included phone answering, filing, organizing files, mail handling, and possibly lifting light objects.  To the first hypothetical question that had been framed by the ALJ, counsel then added the requirement that the individual had to lie down more than an hour each day during work hours due to fatigue and the effects of medication.  With that added requirement in mind, there would be no jobs that the person could perform.  Similarly, if severe foot pain precluded concentration for at least 50% of the day, there would be no work that could be performed.  (Tr. pp. 51-54).  Following the VE's testimony, counsel questioned whether a 50% reduction in job numbers was sufficient.  Counsel further expressed doubt as to whether plaintiff was truly capable of light-level work and stated that the second and third hypothetical questions more accurately described plaintiff's capabilities.  (Tr. pp. 54-56).

Plaintiff challenges the ALJ's decision to deny DIB and SSI benefits on three grounds.  In the first of those, plaintiff argues that the ALJ erred in failing to find that her depression was a severe impairment.

In her written decision of July 14, 2011, the ALJ found that

plaintiff suffered from severe impairments in the form of asymptomatic HIV infection, asthma, and obesity. (Tr. p. 12). However, as respects plaintiff's medically determinable mental impairment of affective disorder and anxiety, the ALJ determined that it did not cause more than minimal limitations in plaintiff's ability to perform basic mental work activities and was, therefore, not severe. (Tr. pp. 12-13). In making this determination, the ALJ considered the four broad functional areas set forth in 20 C.F.R. §§404.1520a(d)(1) and 416.920a(d)(1) and in Section 12.00C of the Listing of Impairments, namely, activities of daily living; social functioning; concentration, persistence, or pace; and, episodes of decompensation. (Id.).

Giving great weight to the findings of Dr. Ducote, the Administration's psychological consultant, the ALJ concluded that plaintiff suffered from only mild restrictions in the activities of daily living, in maintaining social functioning, and in maintaining concentration, persistence, or pace and that there was no evidence of episodes of decompensation of extended duration. (Tr. pp. 12-13, 62-63, 72). Opinions like those that were rendered by Dr. Ducote are entitled to due consideration in the disability adjudication process. 20 C.F.R. §§404.1527(e), 416.927(e). As such, §§404.1520a(d)(1) and 416.920a(d)(1) directed a finding that plaintiff's depression was not a severe impairment, one that significantly effected her ability to engage in work-related

activities.   20 C.F.R. §§404.1521, 416.921.

After finding that plaintiff's depression was not severe and that her impairments did not satisfy the criteria of any of those set forth in the Listing of Impairments, the ALJ made an assessment of plaintiff's residual functional capacity ("RFC") to work. Included within that assessment was the need to work in a low stress environment with only occasional changes in the work setting, limitations that properly accounted for any restrictions resulting from plaintiff's depression.   In arriving at that RFC assessment, the ALJ noted that plaintiff's depression was situational and the result of stressors like her then-ongoing divorce, that she at one time had failed to heed the advice of her treating physician that she seek follow-up care from a psychiatrist, and that the only mental health treatment that she had received was anti-depressants.   (Tr. pp. 14-15).   The lack of more significant treatment other than antidepressant medication points to the inference that plaintiff's depression was not as incapacitating as was alleged.   More importantly, inasmuch as consideration of plaintiff's applications for DIB and SSI benefits proceeded past step two of the §§404.1520/416.920 sequential analysis and was not summarily denied at that step based on the fact that she did not suffer from a severe impairment, this challenge provides no basis for disturbing the Commissioner's decision.   Adams v. Bowen, 833 F.2d 509, 512 (5th Cir. 1987);

Chaparro v. Bowen, 815 F.2d 1008, 1011 (5th Cir. 1987); Wagner v. Astrue, No. 08-CV-0519, 2010 WL 546739 at *7 (E.D. La. Feb. 12, 2010).

In her second challenge to the Commissioner's decision, plaintiff argues that the ALJ failed to apply the proper legal standard by which to assess her credibility.

The law is clear that an ALJ must consider a claimant's subjective complaints of pain and other limitations. Scharlow v. Schweiker, 655 F.2d 645, 648 (5th Cir. 1981). However, it is within the ALJ's discretion to determine their debilitating nature. Jones v. Bowen, 829 F.2d 524, 527 (5th Cir. 1987). The burden is upon the plaintiff to produce objective medical evidence of a condition that could reasonably be expected to produce the level of pain or other symptoms complained of. Selders v. Sullivan, 914 F.2d 614, 618 (5th Cir. 1990); Harper v. Sullivan, 887 F.2d 92, 96 (5th Cir. 1989). The ALJ must then weigh the plaintiff's subjective testimony against the objective medical evidence that has been produced. Chaparro, 815 F.2d at 1010 (citing Jones, 702 F.2d at 621 n.4). The ALJ may discredit a plaintiff's subjective complaints of pain and attendant physical limitations if she carefully weighs the objective evidence and articulates her reasons for doing so. Anderson v. Sullivan, 887 F.2d 630, 633 (5th Cir. 1989)(citing Abshire v. Bowen, 848 F.2d 638, 642 (5th Cir. 1988)). It must be remembered that the evaluation of a plaintiff's subjective

24

complaints is a task particularly within the province of the ALJ for it was the ALJ who had an opportunity to observe the plaintiff, not the Court.  Harrell, 862 F.2d at 480.  In the final analysis, the responsibility of weighing the evidence and determining the credibility of witnesses' testimony and doctors' opinions lies with the ALJ in the first instance.  Carrier v. Sullivan, 944 F.2d 243, 247 (5th Cir. 1991); Greigo v. Sullivan, 940 F.2d 942, 945 (5th Cir. 1991); Wren v. Sullivan, 925 F.2d 123, 129 (5th Cir. 1991); Moore v. Sullivan, 919 F.2d 901, 905 (5th Cir. 1990).

In her written opinion denying plaintiff's applications for Social Security benefits, the ALJ properly cited, inter alia, Social Security Ruling 96-7p and the two-part test for evaluating plaintiff's credibility.  (Tr. p. 14).  She then summarized plaintiff's hearing testimony and weighed it against the objective medical evidence of record in explaining the RFC assessment she had arrived at.  (Tr. pp. 14-15).  As was discussed earlier, that medical evidence reveals that plaintiff had been diagnosed with HIV and asthma in 2003 for which she received conservative treatment over the years which allowed her to work in spite of those conditions.  Vaughan v. Shalala, 58 F.3d 129, 131 (5th Cir. 1995)(citing Fraga, 810 F.2d at 1305 & n.11)(ability to work despite pre-existing condition supports ALJ's finding of not disabled)).  She complained of a depressed mood to Dr. Maynard on October 23, 2009, approximately one year before the alleged onset

date, and was prescribed medication.  When plaintiff was seen by Dr. Haley on April 1, 2010, she was no longer taking antidepressants secondary to financial issues but indicated that other than occasional emotional reactions, overall her depression was well-controlled.  Dr. Haley characterized plaintiff's anxiety/depression as situational.

The results of a stress test that was performed shortly thereafter were normal with no evidence of ischemia, only atypical, non-limiting chest pain.  Although plaintiff complained of continued anxiety/depression secondary to a divorce when she returned to Dr. Haley on August 3, 2010, she had not seen a psychiatrist as had been recommended.  A physical examination was normal except for some foot and left sided back pain.  Plaintiff had been out of Effexor for two months when she was next seen by Dr. Maynard on August 20, 2010.  The diagnosis was asthma, HTN, depression, and migraine headaches; medications were prescribed. On September 16, 2010, plaintiff advised Dr. Haley that she had seen a psychiatrist and was back on Effexor.  No symptoms were noted in the "review of systems" portion of the doctor's treatment note.  Plaintiff was seen again by Dr. Haley on September 24, 2010 for intermittent nausea/vomiting and headaches of two weeks' duration but again a systems review was unremarkable.  The disability onset date alleged by plaintiff was October 1, 2010.

Plaintiff was treated at the Touro ER on October 7, 2010 for

abdominal pain of unknown etiology and a urinary tract infection. She was seen there again on December 19, 2010 for a headache of two days' duration which resolved with medication; the results of a physical examination were normal.   Medication refills were authorized by MCLNO on December 28, 2010.  On February 4, 2011, plaintiff advised Dr. Seal that she had resigned from her job secondary to abdominal pain, migraine headaches, and angina, not as a result of HIV or depression.  Plaintiff saw Dr. Urrutia of the HOP Clinic for a psychiatric consultation on February 23, 2011 and acknowledged that Effexor did help her depression.  She had clear, logical thoughts, no suicidal or homicidal ideations, normal thought processes, and appropriate behavior although she did have a depressed mood, a shy personality, and a constricted affect. Plaintiff was started on Cymbalta and Zolpidem for sleep and was referred to support groups for counseling.  She complained of significant depression when she was seen again by Dr. Seal on March 28, 2011 and a physical examination was largely unremarkable. Nodules were treated at the MCLNO Dermatology Clinic on March 29, 2011.

Plaintiff would next be seen by Dr. Seal on April 28, 2011 for a facial rash and burning/watering of the eyes.  At that time, she advised the doctor that her depression was improving through her treatment with Dr. Urrutia and only mild tenderness to the abdomen was present.  The hearing before the ALJ would subsequently go

forward on June 28, 2011 during which plaintiff testified that she could do some household chores, lift her eighteen-pound grandchild, and sit for eight to ten hours per day.  She acknowledged that her prescribed medication made her calmer, that she had never been hospitalized for any mental impairment, and that no doctor had ever opined that she was incapable of performing work, only recommending that a reduction in job responsibilities might be in order.  The absence of any disability pronouncements by plaintiff's treating physicians is a valid consideration in the disability adjudication process.  Vaughn, 58 F.3d at 131 (citing Harper, 887 F.2d at 97). As the first hypothetical question posed by the ALJ embraced light-level work that allowed for an at-will sit/stand option with low stress with only occasional changes in the work setting, the jobs that the VE identified in answer thereto provided substantial evidence that plaintiff was not disabled.  In light of the body of the evidence that was before her, both subjective and objective, the Court believes that the ALJ's assessment of plaintiff's credibility was a correct one.

In her third and final challenge to the Commissioner's decision, plaintiff alleges that the ALJ's RFC assessment was not a correct one as it failed to account for all of the limitations resulting from all of her severe impairments.

At step three of the §§404.1520/416.920 analysis, the ALJ found that plaintiff's impairments which he properly found were

"severe" did not satisfy the criteria of any of those set forth in the Listing of Impairments. (Tr. p. 13). Having so found, the Regulations mandated that the ALJ make an assessment of plaintiff's RFC which is defined as what a claimant can still do in spite of her limitations. 20 C.F.R. §§404.1520(e), 404.1545, 416.920(e), 416.945. Just like the ultimate decision of whether or not a claimant is disabled, the responsibility for determining an individual's RFC at the hearing level lies with the ALJ. 20 C.F.R. §§404.1527(e)(1), 404.1546(c), 416.927(e)(1), 416.946(c). Given the regulatory charged nature of that duty, the ALJ must make an assessment of a claimant's RFC even where the record is devoid of such an assessment by a medical source as such an assessment is not a medical opinion at all. Joseph-Jack v. Barnhart, 80 Fed.Appx. 317, 318 (5th Cir. 2003).

The ALJ in the present case assessed plaintiff as having a RFC for a range of light work, further limited by an inability to climb ladders/ropes/scaffolds, a need to avoid exposure to extreme temperatures, and a need for work in a low stress environment with only occasional changes in the work setting. In concluding that plaintiff could perform a limited range of light work, the ALJ relied upon the earlier findings of Dr. Anthony Scardino, the Administration's medical consultant, which is the only opinion evidence in the record in which a function-by-function analysis was made. (Tr. pp. 64-66). Although plaintiff testified to being able

to stand for only one hour at a time due to foot pain, she also testified that sitting was a preferable position and that she could do so for eight to ten hours out of the day.  An at-will sit/stand option was thus an appropriate accommodation.  With respect to her testimony about the need to keep her feet elevated to minimize swelling, in none of her doctor's treatment notes was there any mention of such a requirement nor was the presence of edema even noted.  Indeed, the records of plaintiff's foot surgery were not submitted for inclusion in the record below and the Court is hardly in a position to speculate about what the condition of her feet may be.

As the ALJ also noted, while the record reveals that plaintiff received treatment for asthma, spriometric testing was normal. Nevertheless, the ALJ included in the RFC assessment the need to avoid concentrated exposure to extreme heat or cold.  Plaintiff also received treatment for hypertension but a cardiac stress test was within normal limits.  And as was discussed above, limitations due to plaintiff's depression were adequately accounted for in the RFC assessment by inclusion of the need for work in a low stress environment with only occasional changes in the work setting.

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's motion for summary judgment be denied and that defendant's motion for summary judgment be granted.

30

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. <u>Douglass v. United Services Auto. Assoc.</u>, 79 F.3d 1415 (5th Cir. 1996)(<u>en banc</u>).

New Orleans, Louisiana, this __3rd__ day of ___December_____, 201<u>3</u>.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE